[No. A108924. First Dist., Div. Five. Aug. 9, 2006.]

SMALL PROPERTY OWNERS OF SAN FRANCISCO et al., Plaintiffs and Appellants, v.
CITY AND COUNTY OF SAN FRANCISCO, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II.B. and II.C.

1390

## COUNSEL

Zacks Utrecht & Leadbetter, Paul F. Utrecht, Andrew M. Zacks, Eric D. McFarland, Salvatore C. Timpano; Kemnitzer, Anderson, Barron & Ogilvie and Mark F. Anderson for Plaintiffs and Appellants.

Dennis J. Herrera, City Attorney, Kristen A. Jensen, Deputy City Attorney, and Rafal Ofierski, Deputy City Attorney, for Defendant and Respondent.

## OPINION

**REARDON, J.**[*]—Small Property Owners of San Francisco, Jess Pacias, Dan A. Evans, and John Lockley, on behalf of themselves and a class of San Francisco landlords, appeal from a judgment entered after trial. The trial court ruled that an ordinance of respondent City and County of San Francisco (City), which required landlords to pay tenants interest on security deposits at a rate of 5 percent, did not effect a taking under the California Constitution or the United States Constitution. Appellants contend that the court erred in this conclusion and, in reaching its decision, erred in taking judicial notice of credit card interest rates. In addition, appellants argue that the court abused its discretion in requiring them to provide notice of the adverse judgment to class members by mail.

In the published portion of this opinion, we conclude that the ordinance did not effect a taking. In the unpublished portion, we determine that the judgment should be modified in regard to the notice of the judgment to the class. As so modified, the judgment will be affirmed.

### I. FACTS AND PROCEDURAL HISTORY

Beginning in September 1983, San Francisco Administrative Code section 49.2 (Ordinance) required landlords to pay 5 percent interest to their tenants

---

[*]Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

on tenant security deposits held for more than one year. After interest rates on money market accounts dipped below 5 percent, appellants sued the City.

## A. *THE COMPLAINT*

Appellants filed their complaint on April 15, 2002, as a class action on behalf of the owners of one-to-six residential rental units who, pursuant to the Ordinance, were required to pay tenants 5 percent annual interest on their security deposits. They alleged that, due to state law requiring them to return security deposits within three weeks after termination of the tenancy, landlords had to keep the deposits in money market accounts. The interest rate paid by money market accounts beginning in April 2001 was less than 5 percent. On this basis, appellants contended, the Ordinance worked a taking within the meaning of article I, section 19 of the California Constitution and the Fifth Amendment to the United States Constitution. Specifically, appellants alleged: "The difference between the mandated 5% and the money market account yield is a taking without compensation within the meaning of the state and federal constitutions and the plaintiffs and class members have been damaged by having to pay this difference from their own funds." Appellants sought declaratory relief, damages, and an injunction.

## B. *PRETRIAL*

The trial court overruled the City's demurrer to the complaint and denied its motion for summary judgment. Appellants' motion to certify the class was granted.

The matter proceeded to trial, which was bifurcated by stipulation of the parties. The parties presented four questions for resolution:

1. "Could the difference between what landlords could have earned by investing their tenants' security deposits in money market accounts from April 2001 through July 2002 ('the 16-month period'), and the 5% simple annual interest landlords were required to pay for the 16-month period ('the 16-month difference'), amount to a taking under applicable law?"

2. "If the 16-month difference alone could be a taking, must the takings analysis also consider interest rates that were available to landlords in money market accounts <u>before</u> the 16-month period to determine whether the Ordinance effected a taking under applicable law?" (Underscoring in original.)

3. "If interest rates from before the 16-month period must be considered in the takings analysis, what is the time period that must be considered, e.g.,

(1) since the effective date of the Ordinance in September 1983, (2) since the landlord purchased the rental property for which the interest rate shortfall is being asserted, or (3) since the tenancy began for the security deposit at issue?"

4. "In the takings analysis, should landlords' transaction costs arising from their handling of tenant security deposits and paying 5% interest to their tenants be considered in determining liability or damages in this action, and if so, what costs incurred by landlords may be included in the calculation of transaction costs?"

## C. *EVIDENCE AT TRIAL*

Evidence was provided to the court by way of declarations and stipulated facts, which included the following:

The Ordinance requiring landlords to pay to tenants 5 percent on security deposits was in effect from September 1983 through August 4, 2002. Effective August 4, 2002, the Ordinance was amended to require landlords to pay interest at the Federal Reserve discount rate, rather than a fixed rate of 5 percent.

The Ordinance did not require landlords to hold the security deposits in any particular type of account. To the contrary, section 49.2, subdivision (d) of the San Francisco Administrative Code stated: " 'Nothing in this Chapter shall preclude a landlord from exercising his or her discretion in investing security deposits.' " According to a declaration submitted by appellants' economics expert, however, the "relatively small sums of money typically involved in residential rental security deposits, together with provisions of the City's Administrative Code and provisions of California [s]tate law [requiring prompt return of the deposit to a vacating tenant], effectively limit a prudent small property owner's options for investing residential rental security deposits to deposit accounts and money market funds whose proceeds generally are available on demand."

During the 16-month period (roughly April 2001 through July 2002), the interest rate that could be obtained on money market accounts was less than 5 percent. Because the highest rate in bank or money market accounts during the period was 2.2 percent, landlords were required to pay at least 2.8 percent interest on the security deposits from their own funds. The landlord's contribution, therefore, was around 60 percent in the 16-month period.

As to the actual dollar amount of shortfall covered by landlords during the period, appellants' expert estimated $125 on average per landlord, and specifically $281 for appellant Lockley and his two buildings, $51 for appellant Pacias, and $33 for appellant Evans. The City produced evidence, however, that many landlords did not pay tenants *any* of the required interest on tenant security deposits.

Evidence was also produced as to the significance of these out-of-pocket costs in the broader context of appellants' residential rental enterprises. The parties stipulated that, for landlords who held the maximum permitted security deposit (two months' rent), the amount of the interest difference during the 16-month period was 0.47 percent or less of the landlord's annual gross rental income; and for landlords who held less than the legal maximum, the difference was less than 0.47 percent of their gross annual rental income. Furthermore, the parties stipulated, this difference did not prevent class members from earning a fair return on their investment in residential rental properties and had no economic impact on the fair market value of those properties.

The City submitted evidence that the average annual rate of interest on uninsured money market funds from 1983 through July 2002—roughly the effective period of the Ordinance—was *greater* than 5 percent. Appellants countered this evidence with declarations from its expert economist, who estimated that the landlords' administrative and transactional costs in selecting and maintaining their investment accounts amounted to 0.25 percent to 1 percent of the security deposit, thereby reducing the effective rate of return on money market accounts below 5 percent.

### D. *TENTATIVE STATEMENT OF DECISION*

After oral argument by counsel, the trial court issued a tentative statement of decision, which answered the first question in the City's favor: the difference between what landlords could have earned by investing their tenants' security deposits in money market accounts from April 2001 through July 2002, and the 5 percent simple annual interest landlords were required to pay for the 16-month period, did not constitute a taking. With this conclusion, the court found no need to decide the remaining questions. The court did ask the parties to comment on whether it could take judicial notice of the fact that credit card interest rates were higher than 5 percent during the 16-month period.

The parties responded to the tentative statement of decision. Among other things, appellants objected to the court taking judicial notice.

### E. *FINAL STATEMENT OF DECISION*

In its final statement of decision, the trial court determined that the Ordinance was not a taking under any of the tests proposed by appellants. In connection with one aspect of its reasoning, the court took judicial notice of credit card interest rates. The court also concluded it was not bound by the appellate court decision in *Action Apartment Assn. v. Santa Monica Rent Control Bd.* (2001) 94 Cal.App.4th 587 [114 Cal.Rptr.2d 412] (*Action Apartment*)—which held that allegations concerning a Santa Monica ordinance requiring landlords to pay 3 percent on tenant security deposits stated a takings claim—because the Santa Monica ordinance was distinguishable.

Judgment was entered in favor of the City. In response to the City's proposal and over appellants' objection, the court required appellants to provide notice of the adverse judgment to class members by standard mail as well as by a posting on appellants' Web site.

This appeal followed.

## II. *DISCUSSION*

As mentioned, appellants contend the trial court erred in: (1) concluding that the City's Ordinance was not a taking; (2) taking judicial notice of credit card interest rates; and (3) requiring appellants to provide notice of the adverse judgment to class members by standard mail. We address each contention in turn.

### A. *APPELLANTS' TAKINGS CLAIM*

Appellants challenge the Ordinance as a taking under the Fifth Amendment to the United States Constitution and article I, section 19 of the California Constitution. Specifically, they complain that the Ordinance required landlords to pay a 5 percent rate of interest on security deposits during a 16-month period when money market funds were paying less than 5 percent, thus forcing property owners to use their own funds to pay the difference.

The takings clause of the Fifth Amendment to the United States Constitution (Takings Clause) reads: "nor shall private property be taken for public use, without just compensation." It applies against the states through the Fourteenth Amendment. (*Penn Central Transp. Co. v. New York City* (1978) 438 U.S. 104, 122 [57 L.Ed.2d 631, 98 S.Ct. 2646] (*Penn Central*).) The takings clause of the California Constitution, article I, section 19, provides: "Private property may be taken or damaged for public use only when just compensation, ascertained by a jury unless waived, has first been

paid to, or into a court for, the owner." ■ California courts generally construe the federal and California takings clauses congruently. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664 [117 Cal.Rptr.2d 269, 41 P.3d 87] (*San Remo*); see *San Remo Hotel v. County of San Francisco* (2005) 545 U.S. 323 [162 L.Ed.2d 315, 125 S.Ct. 2491, 2501], fn. 18 [assuming "that the California Supreme Court was correct in its determination that California takings law is coextensive with federal law"].) The parties do not contend there is any material difference between federal and California takings jurisprudence.

■ The takings clause is intended to provide private citizens with just compensation when the government takes their private property for public use. It most obviously applies to the government confiscation of an individual's real property, as by eminent domain. Such a "classic" or per se taking includes governmental appropriation of property and the " ' "practical ouster" ' " of the owner from the property. (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 537 [161 L.Ed.2d 876, 125 S.Ct. 2074, 2081] (*Lingle*); see also *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1014 [120 L.Ed.2d 798, 112 S.Ct. 2886] (*Lucas*), citing *Transportation Co. v. Chicago* (1879) 99 U.S. 635, 642 [25 L.Ed. 336].) The takings clause applies as well to government enactments that, while not direct appropriations or ousters, are equivalent thereto. These enactments have been called regulatory takings and fall into three categories. (*Lingle, supra,* 544 U.S. at pp. 537–538 [125 S.Ct. at p. 2081].) The first are those involving a physical invasion of property, such as in *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164], in which state law required landlords to permit the installation of cable television facilities. (*Lingle, supra,* 544 U.S. at p. 538 [125 S.Ct. at p. 2081].) The second are those in which an enactment burdens real property to such an extent that the property has no economically beneficial use, such as in *Lucas, supra,* 505 U.S. at page 1007, in which beachfront property was rendered valueless when a state law prohibited the building of any structures thereon. (*Ibid.*)[1] Finally, a regulatory taking arises if the adverse economic impact, the property owner's investment-backed expectations, and the nature of the governmental action reflect the functional equivalent of a traditional taking. (*Lingle, supra,* 544 U.S. at pp. 538–539 [125 S.Ct. at pp. 2081–2082], citing *Penn Central, supra,* 438 U.S. at p. 124.)

■ Because the takings clause forbids that private property be taken for public use without just compensation, the first step in a takings analysis is to determine what "private property" has been "taken for public use" by means

---

[1] The *Lucas* court acknowledged the difficulty of employing this test in other factual circumstances. For instance, what of a regulation depriving an owner of beneficial use of 90 percent of his property? Has the owner lost all beneficial use of a portion of the property or merely experienced a diminution in the value of the entire parcel? (*Lucas, supra,* 505 U.S. at pp. 1016–1017, fn. 7.)

of the government regulation. We begin our discussion with that determination. We then examine whether a takings clause analysis is appropriate where, as here, the governmental regulation requires the payment of money by one private party to another. Lastly, we conclude that the trial court did not err in ruling that appellants failed to prove a taking.

### 1. *Appellants' Asserted Property Interest*

Appellants do not claim that the City is physically appropriating their *real* property. Nor do they claim that the Ordinance is so burdensome that they cannot maintain their rental business or derive any other economically beneficial use from their real property.

Appellants also do not claim that the Ordinance effects a taking of the *security deposits* that they may hold by contract pursuant to Civil Code section 1950.5.[2] Nor could they. The security deposits belong to the tenants. (*Action Apartment, supra,* 94 Cal.App.4th at p. 599.) Additionally, the corpus of the deposits is not invaded in order to make the payments required by the Ordinance.[3]

Appellants do not argue that the City is taking all the interest generated by the security deposits. Such an argument would also fail, because interest earned on a tenant's security deposit belongs to the landlord only *in the absence of an applicable legislative enactment to the contrary.* (*Korens v. R.W. Zukin Corp.* (1989) 212 Cal.App.3d 1054, 1058–1059 [261 Cal.Rptr. 137] (*Korens*); see also *Brown v. Legal Foundation of Wash.* (2003) 538 U.S. 216, 240 [155 L.Ed.2d 376, 123 S.Ct. 1406] (*Brown*) [interest belongs to owner of principal].) The court in *Korens*, noting there was no state or local law requiring landlords to pay interest that applied in *that* case, declined to create such a duty by implication, particularly since the California Legislature had repeatedly rejected attempts to create one by statute. (*Korens, supra,* at p. 1054; see also *Overland v. Superior Court* (2005) 126 Cal.App.4th 131, 140 [23 Cal.Rptr.3d 676] [bail depositors could not state a takings claim for

---

[2] Civil Code section 1950.5 implicitly authorizes security deposits by explicitly placing limitations on them. A security deposit "shall be held by the landlord for the tenant who is party to the lease or agreement." (Civ. Code, § 1950.5, subd. (d).) If the tenancy is terminated, the security deposit must be returned within three weeks after the tenant vacates the premises. (Civ. Code, § 1950.5, subd. (g).) The landlord may claim amounts from the deposits that are reasonably necessary for certain purposes, including compensation for a tenant's default in payment of rent or damages to the premises. (Civ. Code, § 1950.5, subds. (b), (e).)

[3] It could be said that landlords have a property interest in the security deposit, in the sense that they may have a contractual right to hold the funds during the tenancy as security against tenant default and may use the deposit to defray costs of tenant damages. (Civ. Code, § 1950.5, subds. (b), (d).) This property interest, however, is not alleged by appellants to be affected by the Ordinance, and is therefore immaterial to our analysis.

interest on bail, because their deposit of bail was akin to a contract whose terms did not include payment of interest on the deposit].) But in reaching this conclusion, *Korens* implicitly assumed that, in fact, a local government *could* require landlords to pay tenants the interest they obtained on security deposits. And the court in *Action Apartment, supra,* 94 Cal.App.4th at page 608, reached this same conclusion explicitly: "No doubt, the [city] can compel landlords to give tenants the interest paid by the bank."[4]

What appellants are really arguing, therefore, is that the City should have to compensate them for the amounts they had to pay tenants *from their own funds* in satisfying the requirement that tenants receive 5 percent interest on their security deposits. We discuss next whether a governmental regulation that merely requires appellants to pay money, such as the Ordinance, can be a taking as a matter of law.

### 2. *Does the Takings Clause Apply to Appellants' Asserted Property Interest?*

■ The government's appropriation of money *itself* may be the subject of a taking, as where the government seizes currency or levies upon a bank account. (See *Kitt v. U. S.* (Fed.Cir. 2001) 277 F.3d 1330, 1336 (*Kitt*).) Here, however, the City did not seize any currency or levy upon appellants' bank accounts. It merely required the payment from landlords to tenants of a certain amount of interest on the monies landlords were holding on the tenants' behalf.

Appellants provide no persuasive authority that this type of payment can constitute a taking. The cases on which they rely on this point dealt with property interests distinguishable from the one appellants assert in this case,

---

[4] Thus, the cases on which appellants rely—*Brown, supra,* 538 U.S. 216, *Webb's Fabulous Pharmacies, Inc. v. Beckwith* (1980) 449 U.S. 155 [66 L.Ed.2d 358, 101 S.Ct. 446] (*Webb's*), and *Schneider v. California Dept. of Corrections* (9th Cir. 2003) 345 F.3d 716 (*Schneider*)—are not helpful to their cause. Those cases indicate that governmental diversion of the interest accruing on a fund or account can be a taking for which just compensation may be due to *the one who owns the interest* as a result of his or her ownership of the principal in the fund or account. (*Brown, supra,* at p. 240 ["[a] law that requires that the interest on . . . funds be transferred to a *different owner* for a legitimate public use . . . could be a per se taking requiring the payment of 'just compensation' to the client [*owner of the funds*]" (italics added and omitted).]; *Webb's, supra,* at p. 162 [government appropriation of interest on interpleader fund was a taking of the private property of the owner of the principal]; *Schneider, supra,* at pp. 719–720 [government appropriation of interest on funds owned by prison inmates in inmate trust accounts was a per se taking where inmates owned the principal and the interest].) Here, appellants do not own the principal security deposit (Civ. Code, § 1950.5) *or* the interest.

and *Action Apartment, supra,* 94 Cal.App.4th 587—which appellants discuss extensively and we address, *post*—did not expressly decide the matter. Other decisions, as well as the purpose of the takings clause, cast doubt on whether a monetary obligation such as the one at issue can form the basis of a takings claim.

In *Eastern Enterprises v. Apfel* (1998) 524 U.S. 498 [141 L.Ed.2d 451, 118 S.Ct. 2131] (*Eastern Enterprises*), the United States Supreme Court considered the retroactive application of a provision in the Coal Industry Retiree Health Benefit Act of 1992 (Coal Act), 26 United States Code sections 9701–9722, which in relevant part provided a new mechanism for funding retirement benefits to coal industry employees. (*Eastern Enterprises, supra,* at pp. 503–504, 515.) The plaintiff, a former coal mining company, was required by the Coal Act to pay additional medical benefits to its employees that had not previously been required. The plaintiff contended that the retroactive application of the provision violated both the due process clause and the takings clause of the Fifth Amendment. (*Eastern Enterprises, supra,* at p. 517.)

Five members of the court concluded that the application of the provision to the plaintiff was unconstitutional, but they did not agree on the rationale. Four of them—Justice O'Connor, joined by Justices Rehnquist, Scalia, and Thomas—decided that the provision of the Coal Act amounted to an unconstitutional taking as applied, and did not address the due process challenge. (*Eastern Enterprises, supra,* 524 U.S. at pp. 537–538.) Justice Kennedy provided the fifth vote necessary for the judgment but based his concurrence on the view that retroactive application of the Coal Act violated due process, rejecting any application of the takings clause because there was no "specific property right or interest . . . at stake." (*Eastern Enterprises,* at pp. 540, 541–543, 547–550.) Four other justices—Breyer, joined by Stevens, Souter, and Ginsburg—dissented, reasoning that the takings clause did not apply because the case involved "not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties." (*Eastern Enterprises,* at p. 554.) Further, they concluded, the plaintiff had failed to prove any due process violation. (*Id.* at pp. 553, 556.) Because five of the nine justices in *Eastern Enterprises* decided that the takings clause did not apply to a regulation requiring payment of money, some courts have held this principle must be followed. (See, e.g., *Commonwealth Edison Co. v. U. S.* (Fed.Cir. 2001) 271 F.3d 1327, 1339 (*Commonwealth Edison*) ["[F]ive justices of the Supreme Court in *Eastern Enterprises* agreed that regulatory actions requiring the payment of money

are not takings. We agree with the prevailing view that we are obligated to follow the views of that majority."].) The City would have us adopt this view.[5]

Appellants urge that *Eastern Enterprises* does not govern this case. Of the five justices in *Eastern Enterprise* who concluded that the takings clause was inapplicable, they note, Justice Kennedy confined his objection to a more limited basis, by explaining that takings clause scrutiny is inapplicable to a monetary obligation that was *not imposed with respect to or on a particular property*. Justice Kennedy observed that the Coal Act "regulates the former mine owner without regard to property" and does not "operate upon or alter an identified property interest, and it is not applicable to or measured by a property interest" or "appropriate, transfer, or encumber an estate in land . . . , a valuable interest in an intangible . . . , or even a bank account or accrued interest." (*Eastern Enterprises, supra,* 524 U.S. at p. 540.) Further, he remarked, "[t]he Coal Act neither targets a specific property interest nor depends upon any particular property for the operation of its statutory mechanisms." (*Id.* at p. 543.)

Thus, appellants argue, to the extent the view of the five justices in *Eastern Enterprises* has any precedential value, it is necessarily limited by the scope of Justice Kennedy's concurrence, whereby a monetary obligation is subject to the takings clause if the obligation operates upon, alters, or is measured by an identified property interest. Appellants urge that the Ordinance here is measured by the *security deposits*; this argument is meritless, since the security deposits are owned by the tenants, not the landlords.

---

[5] The parties debate the precedential effect of *Eastern Enterprises*. Because the five justices finding the regulation unconstitutional did not agree on a single rationale, the majority generated no binding precedent. (*Franklin Cty. Conv. Facilities v. American Premier* (6th Cir. 2001) 240 F.3d 534, 552 [in deciding whether retroactivity of CERCLA (Comprehensive Environmental Reponse, Compensation, and Liability Act of 1980; 42 U.S.C. § 9601 et seq.) violates due process, "*Eastern Enterprises* has no precedential effect . . . because no single rationale was agreed upon by the Court"].) On the other hand, another set of five justices agreed that the takings claim lacked merit because the takings clause did not apply, a view subsequently perceived by some courts as binding precedent. (*Commonwealth Edison, supra,* 271 F.3d at p. 1339; see also *Kitt, supra,* 277 F.3d at pp. 1336–1337 [liability to pay tax is not a taking because it is the mere imposition of an obligation to pay money].) While appellants argue that the Ninth Circuit Court of Appeals rejected this conclusion in *Esplanade Properties, LLC v. City of Seattle* (9th Cir. 2002) 307 F.3d 978, 980–981 (*Esplanade*) and *Madison v. Graham* (9th Cir. 2002) 316 F.3d 867, 870 (*Madison*), their argument is misplaced. *Esplanade* and *Madison* concerned the rule that a substantive due process claim cannot exist if the right allegedly infringed *is* protected by the takings clause. The Ninth Circuit concluded that *Eastern Enterprises* did not undermine this rule, because Justice Kennedy's fifth vote found that the right asserted was *not* protected by the takings clause. In any event, neither *Esplanade* nor *Madison* considered whether the takings clause applies to a regulation that only requires payment of money.

It could be argued that the payment required by the Ordinance is "measured" by the landlord's real property: the payment is a percentage of the security deposit; the deposit is ordinarily gauged by the initial monthly rent and, indeed, may not exceed twice that figure; and the initial rent in turn depends upon the property's value in the rental market. We recognize as well that the Ordinance applies only to landlords, and in that sense bears some relation to appellants' use of their real property. While such arguments are quite attenuated, *Eastern Enterprises* does not expressly rule that this sort of regulation, although mandating only the payment of money, cannot be subject to a takings clause analysis.[6] Because the trial court here engaged in a takings clause analysis, we will assume such an analysis is appropriate and proceed to address whether appellants established that the Ordinance effected a taking.

We also embark on this analysis because we think it likely that the proper characterization of appellants' protectible property interest under the takings clause is *not* the money they might have to pay tenants from their own pockets, but a broader interest such as their residential rental enterprise or their ownership of the real property. (See, e.g., *Penn Central, supra,* 438 U.S. at pp. 130–131 [in defining the affected property interest, plaintiff's parcel must be considered as a whole].) Appellants' out-of-pocket loss is merely part of the *economic impact* of the Ordinance, which in light of appellants'

---

[6] We note that the application of the takings clause to regulations mandating only the payment of money leads to odd results. The takings clause does not prohibit government from taking property, but merely requires the government to pay a just price for doing so. (*Brown, supra,* 538 U.S. at p. 235.) Applying the takings clause to regulations that merely require the payment of money is like saying the government can take money, but only if it pays it back. It is far more logical to conclude that a regulation of this sort might be declared invalid as violative of due process, than that the government should give back the money it legitimately took. (See *Homebuilders Assn. v. Tualatin Hills Park* (2003) 185 Ore.App. 729 [62 P.3d 404, 411].) To similar effect is *United States v. Sperry Corp.* (1989) 493 U.S. 52 [107 L.Ed.2d 290, 110 S.Ct. 387] (*Sperry*), in which the court concluded that a deduction of a percentage of an award plaintiff received from the Iran-United States Claims Tribunal was not a taking, but merely a reasonable user fee designed to reimburse the United States for expenses incurred in connection with the arbitration of claims before the tribunal. (*Id.* at pp. 60–61.) The court rejected the plaintiff's argument that the fee was akin to a permanent physical occupation of its property and therefore a per se taking: "It is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible. No special constitutional importance attaches to the fact that the Government deducted its charge directly from the award rather than requiring [plaintiff] to pay it separately. If the deduction in this case were a physical occupation requiring just compensation, so would be any fee for services, including a filing fee that must be paid in advance. Such a rule would be an extravagant extension of [the physical takings doctrine established in] *Loretto* [*v. Teleprompter Manhattan CATV Corp., supra,* 458 U.S. 419 [73 L.Ed.2d 868, 102 S.Ct. 3164]]." (*Sperry, supra,* at p. 62, fn. 9.) *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 876 [50 Cal.Rptr.2d 242, 911 P.2d 429] (*Ehrlich*), on which appellants rely, applied a takings analysis to a requirement that a landowner pay a one-time exaction fee as a condition for the development of real property. An exaction fee is not at issue here. Nor have appellants shown that the Ordinance would fail the standard set forth in *Ehrlich*.

stipulations, and as we show *post*, was not so great as to take a property interest recognized by the takings clause.

### 3. *Takings Clause Analysis*

In the matter before us, the Ordinance did not effect a permanent appropriation of real property or an ouster therefrom. Nor did it involve a physical invasion of real property. Furthermore, as appellants stipulated, the Ordinance did not deprive them of all beneficial economic use of their residential rental properties.[7] Appellants have not established a per se taking. (See *Lingle, supra*, 544 U.S. at p. 538 [125 S.Ct. at p. 2081].)

 Thus, we turn to the multifactor test as set forth in *Penn Central, supra*, 438 U.S. 104. Under that test, three primary factors determine whether a regulation has effected a taking: (1) the economic impact of the regulation on the plaintiff; (2) the extent to which the regulation has interfered with the plaintiff's investment-backed expectations; and (3) the character of the governmental action, including whether there has been a physical invasion or merely an adjustment of the benefits and burdens of economic life to promote the common good. (*Id.* at p. 124.)

### a. *Economic impact*

Appellants' evidence of the Ordinance's economic impact was that, during a 16-month period, the bank and money market accounts in which they placed their tenants' security deposits paid interest at a rate of less than 5 percent. Despite this evidence, the trial court found that the Ordinance did not result in a net negative economic impact for appellants, because "there is no *inexorable* loss to the landlord from having to deposit the security deposit in a losing arrangement." (Italics added.) In other words, landlords would not necessarily have to pay out more interest than they earned on the security deposits, because the Ordinance did not *compel* them to invest the deposits in accounts paying less than 5 percent interest. Indeed, as the trial court noted, landlords could invest the security deposit "in a higher risk venture, use it as

---

[7] Nor did it deprive them of all beneficial economic use of any other property within the meaning of the takings clause. While *Brown* and *Schneider*, on which appellants rely, invoked a per se analysis as to the diversion of all interest from an identified account, those cases are inapposite for reasons already discussed. (See fn. 4, *ante*.) Of course, the mandatory payment of money by appellants out of their own pocket does constitute an appropriation of that property. Thus, we see the somewhat absurd result of applying a takings clause analysis to the payment of money: all payments of money eliminate the payor's interest in the property. In order for the application of the takings clause to payments of money to make sense, we must remember Justice Kennedy's reservation in *Eastern Enterprises* that the payment must be in some way linked to real or personal property. As a result, our analysis focuses on how the payment affects the payor's real property interest. (See fn. 5, *ante*.)

working capital for the rental business, or use it for general personal or business cash flow purposes," constrained only by the obligation that, within a statutory period after the termination of the tenancy, the landlord had to pay the tenant an amount equal to the security deposit and interest, less permissible deductions.

It is undisputed that the Ordinance did not by its terms require landlords to invest the security deposits in the accounts that bore less than 5 percent interest for 16 months. Appellants argue that landlords were in reality forced to use those types of accounts, because only short-term, liquid investments permitted them to meet their statutory obligation to return security deposits within three weeks after the tenancy is terminated and the rental unit is vacated. (See Civ. Code, § 1950.5, subd. (g).) The trial court rejected this argument, stating: "Money is money. So long as the landlord has sufficient funds available to return the amount of the deposit, he or she can use the deposits as set forth above. There was no evidence that San Francisco landlords, or any meaningful portion of them, are so cash poor that they cannot return rental deposit amounts upon short notice without access to the precise funds originally deposited."

The court did not err. While appellants argue that the reason landlords keep sufficient funds in liquid, nonvolatile investments is to make sure they can comply with their obligation to return security deposits to tenants, there was insufficient evidence to establish that assumption. The assertion by appellants' economic expert that landlords *should* keep the deposits in liquid accounts (and reference to a survey indicating they do) did not prove the underlying supposition that landlords had no other funds from which to satisfy the obligation to return tenant deposits promptly. Similarly, while the individual named plaintiffs invested the funds in deposit or money market accounts, it was not proven that this was compelled by the need to meet their legal obligations, much less by the Ordinance itself. Based on the record in this matter, the Ordinance did not condemn appellants to a loss of money even during the 16-month period appellants select.

Furthermore, in focusing on the 16-month period in which short-term, liquid investment vehicles paid less than 5 percent, appellants failed to show that landlords experienced a net economic loss over the time they rented out the real property, or over the 19 years the Ordinance was in effect.[8] To the

---

[8] The City contends we must consider interest rates over the entire 19-year history of the Ordinance to evaluate its economic impact, because looking solely at the 16-month period in which interest rates on short-term, liquid accounts were less than 5 percent violates the "parcel as a whole" doctrine, as applied in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency* (2002) 535 U.S. 302 [152 L.Ed.2d 517, 122 S.Ct. 1465] (*Tahoe-Sierra*). The City misreads *Tahoe-Sierra* somewhat in this regard. The parcel as a whole doctrine requires

contrary, the trial court found: "From the date of the enactment of the Ordinance and continuing for approximately 19 years, the prevailing rate on interest[-]bearing deposit accounts at traditional financial institutions available to landlords in San Francisco was in excess of 5%. During this period, a landlord could, but was not required to, place the security deposit in a deposit account at a market rate and earn enough interest to pay the tenant 5% and make a profit."

Substantial evidence supported this conclusion, as the City produced evidence that the overall average yield for taxable, retail, money market funds was 5.14 percent for the period from January 1985 through July 2002. Even considering the transactional costs associated with maintaining an interest-generating account, as appellants urge us to do, there is no evidence that landlords experienced a net economic loss from the holding of the deposits.

Moreover, even if landlords were effectively forced to invest in bank or money market accounts, *and* we considered only the 16-month period when those accounts paid less than 5 percent interest, the landlords' loss was minimal. As the parties stipulated, for landlords who held the maximum permitted security deposit, the amount of the interest difference claimed by appellants for the 16-month period was no more than 0.47 percent of the landlord's annual gross rental income. Each affected landlord had to cover on average a shortfall of approximately $125. For appellant Lockley, the short-fall for the 16-month period amounted to $281 for two buildings, while appellants Pacias and Evans "lost" just $51 and $33 respectively. While the parties debate whether this loss should be considered in the broader context of the landlord's gross rental revenue and other business expenses, these sums are small by either measure.

the court to examine the entirety of the subject parcel and its potential uses in determining the effect of the regulation. (See *Tahoe-Sierra, supra,* at pp. 326–327.) In *Tahoe-Sierra,* owners of undeveloped parcels challenged a 32-month building moratorium, arguing that it deprived them of all economic use of their property for 32 months. (*Id.* at pp. 314, 320, 331.) The court rejected the landowners' attempt to define their property interest by severing the 32-month period from their fee simple estate, because defining their property interest "in terms of the very regulation being challenged is circular" as "every delay would become a total ban." (*Id.* at p. 331.) In line with the "parcel as a whole doctrine," the court observed, the landowner's property interest must be defined by its true temporal aspect as well as its geographic dimensions, and a temporary prohibition on economic use does not render valueless a fee simple estate. (*Ibid.*) The holding in *Tahoe-Sierra* does not directly support the City's argument that appellants cannot sever the 16-month period from the 19-year history of the Ordinance; although it does confirm that appellants cannot sever the 16-month period from the amount of time *they have owned their property. Tahoe-Sierra* may also support the City's argument that appellants' out-of-pocket loss must be viewed in the context of their rental business as a whole.

Offsetting this minimal out-of-pocket loss were economic *benefits* to the landlord in being able to hold the security deposit. As the trial court found: "By holding [the tenant's security deposit], the landlord secures certain obligations of the tenant, thereby avoiding potential costs of collection should such obligations be breached. Indeed, it is common sense to conclude that without such a deposit, many times landlords would have no hope of collecting from their tenants for the breach of obligations secured by the deposit. This gives the landlord an important potential economic benefit that also offsets the 5% interest cost to the tenant. Clearly, the fact that tenants get interest facilitates the taking of security deposits by landlords." The trial court was not unreasonable in drawing this conclusion.[9] Indeed, any landlord who viewed the burdens of the Ordinance to outweigh the benefits of holding the tenant's security deposit could simply return the deposit to the tenant and have no further obligation to pay the interest.

Appellants nevertheless contend that the Ordinance effects a taking according to the decision in *Action Apartment, supra,* 94 Cal.App.4th 587. There, Santa Monica landlords were required to place tenant security deposits in an interest-bearing account at a federally insured, financial institution, which paid between 0.5 percent and 1.5 percent interest. (*Id.* at pp. 595, 605.) A 1999 ordinance required landlords to pay 3 percent on security deposits held for at least one year. (*Id.* at p. 595.) Landlords sued, complaining inter alia that the ordinance was invalid under the takings clauses. The defendant's demurrer was sustained. (*Id.* at p. 597.) On appeal, the court held that the demurrer should have been overruled, because the allegations stated a takings claim. (*Id.* at p. 621.)[10]

In applying the economic impact factor of *Penn Central,* the appellate court in *Action Apartment* considered the landlords' allegation that banks had been paying up to 1.5 percent on tenant security deposits, so the requirement that landlords pay tenants 3 percent interest meant that, out of their own pockets, landlords were furnishing 50 percent to 83 percent of the interest

---

[9] The trial court also considered the cost to a landlord of having to borrow money for the purposes to which landlords could put tenant security funds, taking judicial notice that landlords would have to pay more than 5 percent interest if they borrowed such funds on credit cards. Appellants contend the landlord's cost of borrowing funds is immaterial and, besides, landlords could borrow money on more favorable rates than those offered by credit cards. For this and other reasons discussed *post,* appellants argue that the court erred in taking judicial notice of credit card rates. We need not consider these issues, since we uphold the judgment for reasons other than the cost of funds.

[10] *Action Apartment* held that the Santa Monica ordinance was a taking under both the *Penn Central* multifactor test and a test by which government action was deemed a taking if it failed to substantially advance a legitimate government interest (*Agins v. Tiburon* (1980) 447 U.S. 255, 260 [65 L.Ed.2d 106, 100 S.Ct. 2138]). We do not address this latter theory, since the United States Supreme Court subsequently rejected the substantial advancement test in *Lingle, supra,* 544 U.S. at pages 544–545 [125 S.Ct. at page 2085].

owed to tenants. (*Action Apartment, supra,* 94 Cal.App.4th at p. 605.) Each landlord, on average, would pay $82.50 more for each rental unit over three years, for a loss of about $718 per landlord. (*Id.* at p. 606.) By comparison, appellants argue, the Ordinance resulted in San Francisco landlords paying more than 60 percent of the interest due to tenants—in the 16-month period where interest rates on liquid accounts dipped below 5 percent.

*Action Apartment* is distinguishable from the matter before us. Here, landlords were not *required* to place their tenants' security deposits into an account that bore interest below the rate they had to pay the tenants. Accordingly, while the allegations in *Action Apartment* suggested that every moment of the three-year life of the Santa Monica ordinance (i.e., before the 3 percent rate might be adjusted under the terms of the ordinance) would result in an economic loss for Santa Monica landlords, there was no evidentiary showing in the instant case that the Ordinance compelled San Francisco landlords to lose any money at all. Based on that critical distinction, *Action Apartment* is not controlling.[11]

Appellants point out that the court in *Action Apartment* construed a loss of $718 per landlord as *not* de minimis, since "[a] small taking is still a taking." (*Action Apartment, supra,* 94 Cal.App.4th at p. 606.) However, while a small *taking* is still a taking, a small *loss* is less likely to be a taking. Obviously, the size of the amount diverted by the regulation must be considered when determining the regulation's "economic *impact.*" Here, the average loss per landlord was about $125—roughly one-sixth of the amount in *Action Apartment.* Moreover, where as here the economic impact is small or nonexistent, it becomes more difficult for appellants to demonstrate a taking based on the other two *Penn Central* factors—to which we turn next.

b. *Investment-backed expectations*

The trial court ruled that the Ordinance did not interfere with appellants' investment-backed expectations as landlords, for two reasons. First, as to their expectations for the residential rental enterprise overall, the parties *stipulated* that the difference between 5 percent and prevailing money market rates during the 16-month period was *not* so great as to prevent appellants from earning a fair return or maintaining the fair market value of their

---

[11] Because of the distinction between *Action Apartment* and the matter at hand, the trial court, contrary to appellants' assertions, was not obligated to follow *Action Apartment* under *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].

property. Second, as to any investment expectations they might have had in regard to their tenants' security deposits, appellants presented no *evidence* of any investment-backed expectation that landlords would be able to keep the interest they might earn on the deposits. As the trial court observed: "given that the security deposits belong to the tenants, there can be no reasonable landlord expectation of a continued investment opportunity for this money."

Appellants respond with a passage from *Action Apartment*, in which the court asserted: "Landlords might have expected that, some day, they would have to pay security deposit interest to their tenants . . . , but they surely did not expect that the payments *would* exceed the interest paid by banks." (*Action Apartment, supra,* 94 Cal.App.4th at p. 606, italics added.) As mentioned, however, *Action Apartment* is distinguishable. There, the ordinance required landlords to invest tenant security deposits into funds that, since the inception of the ordinance, would pay landlords less interest than landlords had to pay to the tenants. Here, by contrast, nearly two decades passed under the Ordinance before the landlords' return on security deposits, even in money market accounts, was less than the 5 percent fixed rate. It is reasonable for landlords to foresee that some time in the course of their ownership of their residential rental property, at some point during the effective period of the Ordinance, the 5 percent they had to pay to tenants would exceed the return they would get on those funds if they placed the funds in a money market account.

In any event, *Action Apartment* was decided at the demurrer stage, where the allegations of the amended complaint were necessarily assumed to be true. Here, we review the decision of the court after a trial. Appellants in this matter failed to present *evidence* that the landlords' reasonable investment-backed expectations, under the circumstances, did not contemplate the possibility that they would have to make up the shortfall if they chose to keep tenant security deposits in money market accounts. Accordingly, appellants failed to establish that the Ordinance operated contrary to their investment-backed expectations.

c. *Character of governmental action*

Lastly, we turn to the nature of the Ordinance. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (*Penn Central, supra,* 438 U.S. at p. 124.)

The Ordinance obviously does not physically invade appellants' property. To the extent it touches upon appellants' property interests, it operates as part of a regulatory scheme adjusting the benefits and burdens of economic life between landlords and tenants.

The trial court noted "the following adjustments to economic life" meted out by the Ordinance within the context of the broader statutory and regulatory arrangement for security deposits: "the tenant gives his or her money to the landlord as a deposit to secure tenancy obligations. The landlord gets to use this money as he or she sees fit. The landlord pays a reasonable cost of funds for that privilege, which costs do not impact the value of the rental business. The tenant gets a reasonable rate of return on this deposit [as suggested by the average return on money market funds between January 1985 to July 2002 being in excess of 5 percent], which eases the burden of giving the money to the landlord and effectively lowers rent in San Francisco by giving tenants some return on their security deposits which if not deposited with the landlord, might be available to earn income. This scheme must be seen as a regulatory adjustment of the benefits and burdens of the economic life of landlords and tenants that rationally promotes the common good of both." We add that the common good of landlords and tenants in San Francisco also provides a benefit for the public, enjoyed by appellants as members of the public as well. (See *San Remo, supra,* 27 Cal.4th at pp. 675–676 [advantage hotel owners receive from ordinance requiring fee for hotel conversion "lies not in a precise balance of burdens and benefits accruing to property from a single law, or in an exact equality of burdens among all property owners, but in the interlocking system of benefits, economic and noneconomic, that all the participants in a democratic society may expect to receive, each also being called upon from time to time to sacrifice some advantage, economic or noneconomic, for the common good"].)

Appellants again refer us to *Action Apartment,* which in this regard found that the Santa Monica ordinance, in requiring landlords to pay interest to tenants at a fixed rate regardless of market conditions, was remote from the public welfare and was apparently designed only " 'to transfer wealth from landlords . . . to tenants.' " (*Action Apartment, supra,* 94 Cal.App.4th at p. 606.) The Santa Monica ordinance was "quite unusual," the court opined, because it treated "private landlords like banks" but did not allow them to lower interest rates during an economic downturn. (*Id.* at pp. 606–607.) Furthermore, the ordinance took "an investment opportunity provided by banks—the payment of interest on deposited funds—and imposed it on private landlords." (*Id.* at p. 607.) For these reasons, the character of the city's action in implementing the ordinance contributed to the court's conclusion that the landlords had stated a takings claim. (*Id.* at pp. 606–608.)

While appellants contend that San Francisco's Ordinance is "obviously" the same as the Santa Monica ordinance, it obviously is not. As we have discussed, the Santa Monica ordinance *required* landlords to place security deposits into funds that paid interest at a rate less than what landlords had to pay to their tenants, while the San Francisco Ordinance did not. Thus, the ordinance in Santa Monica might be said to have forced individual landlords to bear more than their fair share of a supposed public obligation to ensure that tenants obtain a reasonable rate of interest on their security deposits. The same conclusion cannot be drawn in the matter before us, in light of the freedom San Francisco landlords had to invest the funds in accounts with a higher return, as well as the evidence that the fixed 5 percent rate was *less* than the historic rate of return available to landlords even on money market accounts.

██ Moreover, perhaps because of the demurrer context of *Action Apartment,* the court in *Action Apartment* focused on the burden of the ordinance to landlords and its benefit to tenants, and whether it thought this adjustment of economic benefit and burden was fair. The appropriate question for the third prong of a regulatory takings analysis, however, is the *nature* rather than the merit of the governmental action, and particularly whether the regulation is closer to a governmental adjustment of economic benefits and burdens—for the public good when viewed in the broader context of economic life—than to a physical invasion of property. At the trial in the matter before us, appellants failed to establish that the nature of the Ordinance was offensive to the takings clause, or that it placed an undue burden upon landlords in order to promote a public purpose.

██ Given the small or nonexistent economic loss occasioned by the Ordinance, appellants' failure to prove that this loss was inconsistent with reasonable investment-backed expectations of San Francisco landlords, and the nature of the Ordinance as part of a broader scheme of allocating economic benefits and burdens between landlords and tenants for the public good, the trial court did not err in concluding that the Ordinance did not effect a regulatory taking under *Penn Central.*

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1388.

### III. *DISPOSITION*

The judgment is modified to require appellants to provide notice of the judgment on their Web site. The requirement of notice by standard mail is stricken. As so modified, the judgment is affirmed. Each party shall bear its own costs on appeal.

Jones, P. J., and Gemello, J., concurred.